Argued and submitted April 7, affirmed April 28, 1981

# STATE OF OREGON,
*Respondent,*

*v.*

# BILLY JEAN MULDER,
*Petitioner.*

(TC 27131, CA 18649, SC 27622)

629 P2d 816

Fred E. Avera, II, Dallas, argued the cause for petitioner. With him on the briefs was Avera and Avera, Dallas.

Virginia Linder, Assistant Attorney General, argued the cause for respondent. On the brief was John L. Snyder, District Attorney, Polk County.

Before Denecke, Chief Justice, and Tongue, Lent, Linde, Peterson and Tanzer, Justices.

TONGUE, J.

**TONGUE, J.**

Defendant appealed to the Court of Appeals from his conviction of "driving while suspended," ORS 487.560. He contended on that appeal that the evidence was insufficient for conviction because he was arrested while driving on the parking lot of an apartment complex which, according to defendant, was not "open to the public" within the meaning of ORS 487.535, which provides that Oregon statutes relating to major traffic offenses "apply upon any premises open to the public."

The Court of Appeals affirmed without opinion. 50 Or App 1, 622 P2d 1160 (1981). We allowed defendant's petition for review because of our concern whether that parking lot was "open to the public" within the intended meaning and purpose of ORS 487.535, which provides as follows:

"(1)  The provisions of chapter 451, Oregon Laws 1975, relating to the major traffic offenses defined in ORS 487.530 apply upon any premises open to the public.

"(2)  As used in subsection (1) of this section, 'premises open to the public' includes any premises open to the general public for the use of motor vehicles, whether the premises are publicly or privately owned and whether or not a fee is charged for the use of the premises."

It was stipulated that defendant, at a time when his driver's license was suspended, was driving his motor vehicle on the parking lot of the Brush College Village Apartments in Salem. There are twenty apartments in four buildings. The parking lot and driveway leading into it was described as one in the shape of a "C" which "intertwines around the front of the entrances to the buildings," with a driveway from Brush College Road at one end and a "dead end" at the other. There are "head in" parking "stalls" for the twenty tenants in front of each building and additional "stalls" marked "visitors." The manager of the apartments testified that although "we don't invite the public in," this roadway and parking lot was "open to the public" and was used not only by tenants and visitors, but also by paperboys, the milkman and "people like that," and that no attempt was made "to block off members of the public."

On his appeal to the Court of Appeals, defendant assigned as error the denial by the trial court of defendant's

motion for judgment of acquittal, which was made on the ground that the state had "failed to prove an element of the crime: that is, that the defendant drove upon premises 'open to the public'" and that this parking lot "is not premises open to the public." In his petition for review, defendant's sole contention is that this parking lot was "neither a 'highway' nor 'premises open to the public'" within the intended meaning of ORS 487.535 and that a contrary interpretation of that statute, as adopted by the trial court, is "incorrect and contrary to the legislative history of ORS 487.535." In support of that contention, defendant says that:

"Mr. Donald Paillette, the Project Director, explained that the measure would make the Vehicle Code applicable to parking lots at such places as taverns, department stores and supermarkets. It was specifically noted that the statute would not extend the application of the code to the private parking areas of apartments or condominiums. Minutes, Interim Committee on the Judiciary, September 24, 1974, P. 14.

"From the minutes noted above it seems that the legislature did not intend for the Vehicle Code to regulate driving in the type of area herein involved."[1]

Upon examination of the legislative history of ORS 487.535, it appears that it was adopted as Section 86 of the Oregon Vehicle Code of 1975. In the official "commentary" upon that section, its purpose was stated to be as follows:

"The section applies the provisions relating to serious traffic offenses to *premises open to the public'* which *would include* locations such as *parking lots and other areas off the highway.* This broadens the application of these provisions beyond the general provision of § 4 which would otherwise apply the rules only to vehicles operated on the highway. The committee believes that *the named offenses,* most of which are crimes, *involve the kind of conduct that is so flagrant and dangerous as to warrant prohibition of such conduct on non-highway locations that are open to the general public for use of motor vehicles."*(Emphasis added)

According to the Minutes of the Interim Committee on Judiciary, September 24, 1974, pp 13-14, Mr.

---

[1] No contention was made by defendant that ORS 487.535 was so ambiguous as not to give "fair warning" of the nature of the conduct declared to be a criminal offense, thus raising a constitutional question, as in *State v. Duggan,* 290 Or 369, 622 P2d 316 (1981).

Paillette, in explaining the intended application of the statute and in answer to a question by Representative Paulus, said that:

> " '* * * he believed section 1 would be applicable to parking lots for such places as taverns, department stores, supermarkets, *etc.* ' " (Emphasis added)[2]

It also appears that in explanation of the then-proposed bill to the Senate Committee on Judiciary it was stated by Mr. Paillette that:

> " '*The intent here is to apply these offenses (Class A traffic offenses) to parking lots, off-highway locations where under ordinary circumstances the public driving vehicle is used on these premises.* It means that contrary to the existing law wherein in order to be guilty of one of these offenses it has to be established that it is committed on a public highway. This would enable an arrest to be made in a DUIL situation even though the driving had not yet occurred on a public highway. *There is no distinction between a public parking lot and one privately owned.* ' Minutes, Senate Committee on Judiciary, January 23, 1975, p. 3." (Emphasis added)

As we read the legislative history of ORS 487.535, the primary purpose of that statute was to enlarge the zone of statutory protection of the public for Class A traffic offenses from public highways to "non-highway locations that are open to the general public for use of motor vehicles" and where persons and their vehicles are subjected to danger by drunken, reckless, unlicensed and "hit and run" drivers; that although specific reference was made in the legislative history to parking lots for such places as

---

[2] The same minutes show that comment was made by a judge who appeared at that meeting that "so-called private parking areas for apartments and condominiums," which "often [post] signs limiting parking to residents or guests" and would not therefore be "open to the public," did not appear to be covered. According to those minutes:

> " 'Sen. Carson agreed that an apartment house complex *posting a sign at the entrance saying it was private property and not open to the public* would take itself out from under the provisions of section 1. However, he believed this was preferable to a provision saying that even when posted, the property would be considered to be open to the public.' Minutes, Interim Committee on Judiciary, September 24, 1974, pp. 13-14." (Emphasis added)

We do not, however, attach any controlling significance to this colloquy, although no such sign was posted on the parking lot in this case.

taverns, department stores and supermarkets, there was no intent to limit the application of the statute to those specific parking lots but that, on the contrary, the intention was to make "no distinction between a public parking lot and one privately owned," and to extend the protection of the statute to all parking lots which share similar characteristics of public access and exposure to danger from such improper driving of motor vehicles.[3]

There was testimony in this case by the manager of the apartments that there was no "attempt made to block off members of the public" from the use of this parking lot and that it was "open to the public." Under the facts of this case, including this testimony, we are of the opinion that there was sufficient evidence from which the trier of the facts could properly find that the parking lot on which defendant was driving his motor vehicle was one which constituted "premises open to the public" within the intended purpose and meaning of ORS 487.535.

For these reasons we affirm both the judgment of conviction by the trial court and the decision of the Court of Appeals affirming that judgment of conviction.

**LENT, J.,** dissenting

Defendant was charged by amended information of the district attorney with "driving while suspended," ORS 487.560. The amended information charged that the prohibited driving was "upon premises open to the public, to-wit: a parking lot near Brush College Road, N.W." I shall assume for the sake of this discussion that ORS 487.535(1) intends to prohibit "driving while suspended" upon premises open to the public, although the language chosen to accomplish that intention is not absolutely clear. I do so because defendant has not challenged the effectiveness of the language in that respect. Moreover, I agree with the majority that defendant did not raise a "fair warning" issue. See majority opinion, n. 1.

The case was tried without a jury, and at the close of evidence defendant moved for a judgment of acquittal, ORS 136.445,

---

[3] Cf. *State v. Brusseau,* 33 Or App 501, 504, 577 P2d 529 (1978).

"on the ground that the state has failed to prove an element of the crime; that is, that the defendant drove upon premises open to the public. The theory that the state has proven through the evidence and stipulation is that he drove a vehicle and that he drove a vehicle on the parking lot described by Mrs. Johnson on Exhibit A, but we assert that that parking lot is not premises open to the public. That being an element of the offense of driving while suspended, we would move for a judgment of acquittal."

The trial court denied the motion without explanation and then, apparently as trier of fact, made a "finding" that the parking lot described by Mrs. Johnson, the apartment manager, "is premises open to the public within the meaning of the statute."

Defendant's assignment of error was in denying his motion for judgment of acquittal. This raised only the question of whether the trial court was correct in finding that there was evidence which would support a verdict against the defendant. There was no jury, which relieved the trial court from having to define for the jury what is meant by the "general public," upon which the statutory definition of "premises open to the public" turns. There is nothing to indicate what the trial judge thought "general public" meant, and there is nothing to indicate that the defendant contended for any definition, rejected by the trial judge, of the term "general public." In other words, there is nothing in the record to show what was the trial judge's concept of the meaning or application of the term "general public"; nevertheless, he made a decision which necessarily depended upon ascribing, as either a matter of law or of fact, or of both, some precise meaning to that term.

The only witness to testify as to the use of the parking lot for driving was Mrs. Johnson, the apartment manager. She testified that merchants, such as milkmen and paperboys, and visitors of tenants used the lot, in addition to the tenants. As the majority has said, she testified that the lot was "open to the public," and that no attempt was made to "block off members of the public." No place in the evidence, on direct or cross examination, was she ever asked whether the apartment parking lot was

open to the "general public." The closest she came to speaking of the "general public" was to answer "Yes" to the following question on direct examination: "And are they generally then open to the public?" On cross examination she testified:

"Q.  * * * By generally open to the public, do you mean that the public is not barred from coming in there?

"A.  No, they are not barred.

"Q.  By saying that it's generally open to the public, you're not saying that the public is generally invited in [?]

"A.  No, we don't invite the public in. Actually, we prefer the public out because it is not a thoroughfare. There's one way in and you have to leave the same way."

Obviously both the prosecutor and the defendant's counsel equated "generally open to the public" with "open to the general public." I submit each missed the mark as to the issue involved. The legislature chose to define "premises open to the public" in terms of availability of the premises for use by the "general public." The motion for judgment of acquittal requires that the court find that there is evidence that the premises were open to the "general public" for the use of motor vehicles. This, of course, requires someone to state what is meant by "general public." The legislature apparently decided someone else should do it. If it is an issue of fact, no one did it in the evidence. The trial court did not do it, either as a matter of fact or as a matter of law. The Court of Appeals issued no opinion.

That leaves this court as having to do it in order to affirm this conviction. I have searched the majority opinion in vain for any definition of the words "general public." The only places those words are even mentioned are in quotations from ORS 487.535, in quotations from the general commentary of the drafters of the Oregon Vehicle Code of 1975, and in testimony before the legislature of the drafters' Project Director. In none of those sources is the term "general public" defined.

Instead of giving any definition of the term "general public," the majority cites us to the commentary and the Project Director's testimony as to what the drafters were trying to do. We are given examples of the sort of premises the drafters had in mind. The examples do not even specifically include an apartment house parking lot such as this.

Nevertheless, the majority holds, apparently as a matter of law, that this lot was of the kind noted in the examples.

I submit that it is not even the same kind of lot as those used by the Project Director in his testimony to the legislature. In answer to a question calling for an answer as to what kind of premises were intended to be covered, the Project Director mentioned "taverns, department stores, supermarkets, etc." The majority underscores "etc." as if it has some special significance. In Webster's Third New International Dictionary, 1976, the first definition of "et cetera" is "and others esp. of the same kind."

Assuming that a criminal conviction should rest upon this kind of legislative history, in which the majority finds special significance in the use of an "etc.," I would point out that each of the examples refers to the parking lot of some mercantile, retail business establishment. Presumably those lots are for the use of prospective customers, but even if they are open to persons using them as a way from one point to another rather than as a destination, they are of a different kind than this apartment parking lot. There is no evidence whatsoever in this record that any occupant of this apartment conducted an on-premises business, selling merchandise, or even services, and had customers who used the parking lot. There is no evidence whatsoever that the apartment parking lot was used as a way rather than a destination. Indeed, the uncontradicted evidence of the state's witness is that there was no thoroughfare; this was a dead-end driveway, barely wide enough for a car to pass between the parking stalls on both sides of the drive. The kind of "merchants" who used the lot were deliverymen of one sort or another.

It simply does not seem to me that this is the kind of premises or the kind of "general public" with which the statute is concerned, either by its terms or by the examples found in the legislative history.

Neither the legislature nor the courts have defined that term which must be defined so as to give a standard against which to test the sufficiency of this evidence to support a verdict of guilty of the crime charged. In the long run, the courts do a disservice to the common weal when the courts undertake to uphold *felony* convictions for

alleged violations of statutes as poorly drafted as this one. It were better, over the long haul, to send the legislature back to the drawing board to correct its errors than to forgive that body for its false starts by deciding cases upon the basis of what the legislature tried to do rather than what it did, or didn't, do. *Compare,* majority opinion, n. 1.

Defendant's motion for judgment of acquittal should have been granted.

I dissent.

Linde, J., joins in this dissent.